# Illinois Official Reports

## Appellate Court

***People v. Bustos*, 2020 IL App (2d) 170497**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LUIS F. BUSTOS, Defendant-Appellant. |
| District & No. | Second District<br>No. 2-17-0497 |
| Filed | October 29, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 16-CF-891; the Hon. James Hallock, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Thomas A. Lilien, and Christopher McCoy, of State Appellate Defender's Office, of Elgin, for appellant.<br><br>Joseph H. McMahon, State's Attorney, of St. Charles (Patrick Delfino, Edward R. Psenicka, and Victoria E. Jozef, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

JUSTICE BIRKETT delivered the judgment of the court, with opinion.
Justice Zenoff concurred in the judgment and opinion.
Justice Hudson specially concurred, with opinion.

## OPINION

¶ 1    Following a jury trial, defendant, Luis F. Bustos, was convicted of multiple counts of aggravated domestic battery and domestic battery. The trial court merged the convictions into a single count of aggravated domestic battery. On appeal, defendant raises five issues: whether (1) the trial court erred in admitting unfairly prejudicial and irrelevant evidence, (2) the trial court failed to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), (3) trial counsel was ineffective, (4) cumulative error deprived defendant of a fair trial, and (5) the trial court improperly relied on a factor inherent in the offense in imposing its sentence. For the following reasons, we affirm.

¶ 2                                I. BACKGROUND
¶ 3    On May 27, 2016, defendant had a verbal and physical altercation with Karina Estrada, his girlfriend and mother of their daughter, A.B. As a result of that altercation, Karina sustained multiple injuries and miscarried a pregnancy. The May 27 alteration was not the first time defendant inflicted injuries on Karina. On October 3, 2014, defendant pleaded guilty to domestic battery (bodily harm), based upon a November 29, 2012, incident in which he beat Karina.

¶ 4    Defendant was initially charged on May 30, 2016, in a five-count complaint alleging that he strangled and struck Karina about the head and body. In connection with the criminal complaint, the court granted Karina's petition for an emergency order of protection. On June 30, 2016, defendant agreed to the entry of a plenary order of protection. On August 16, 2016, a Kane County grand jury returned an indictment charging defendant with five separate counts. Count I alleged that defendant committed aggravated domestic battery (720 ILCS 5/12-3.3(a-5) (West 2016)), a Class 2 felony, by strangling Karina. Count II alleged that defendant committed aggravated domestic battery (*id.* § 12-3.3), another Class 2 felony, based on making physical contact of an insulting or provoking nature by strangling Karina. Count III charged defendant with aggravated domestic battery (*id.* § 12-3.3(a)), a Class 2 felony, alleging that defendant caused great bodily harm by striking Karina and causing her to miscarry. Count IV alleged domestic battery (*id.* § 12-3.2(a)(1)), a Class 4 felony. Finally, count V charged defendant with domestic battery (*id.* § 12-3.2(a)(2)) for contact of an insulting or provoking nature.

¶ 5    Prior to trial, the trial court granted the State's motion *in limine* to introduce defendant's 2014 domestic battery conviction to establish defendant's propensity and *modus operandi*. 725 ILCS 5/115-7.4(a) (West 2016). The trial court also granted the State's motion *in limine* to admit a recording of defendant's telephone call from the Kane County jail, in which he discussed the confrontation with Karina. However, the court ordered that four lines of the call's transcript be redacted because they would have disclosed to the jury that the call was made from the jail and the court did not want the jury to "find [defendant] guilty just because [the

call] was coming from the jail." The trial court granted defendant's motion to exclude evidence that there was an order of protection issued in conjunction with the case.

¶ 6  The trial commenced on March 6, 2017. Karina, age 24, testified that on May 27, 2016, she lived in an apartment in Carpentersville with A.B. (who was five years old at the time of trial) and defendant. Karina stated that she met defendant when they were in fifth grade and that they dated for nine years.

¶ 7  Karina then described the day of the May 27, 2016, physical altercation. Karina and defendant took A.B. to Belvidere so she could play with her cousins on defendant's side of the family. While in Belvidere, Karina and defendant argued over defendant "adding girls on Facebook." They had similar problems in the past that upset Karina. The argument continued on the car ride home. Defendant "wasn't really responding" to Karina because he did not wish to argue in front of A.B. At that point, the argument consisted of "all words." Instead of going directly home, they stopped at the home of one of defendant's friends. While there, defendant again "started to add more girls on Facebook," which upset Karina again. Karina told defendant she wanted to leave.

¶ 8  Karina drove back to her apartment, which took only about a minute. During the trip, she and defendant continued to argue. When they arrived at Karina's apartment, Karina told defendant that she wanted defendant to leave, telling him to "just get your stuff and get out." Defendant began to exit the car while it was still moving in reverse. Defendant jumped out of the way and hit the ground. Karina asked him why he acted like she hit him, but defendant did not respond. He "grabbed" A.B. out of the back seat and took her inside the apartment. Karina told defendant that she did not want him "to get in the apartment," but he ignored her.

¶ 9  Once inside the apartment, defendant put A.B. to bed. When Karina came out of the bedroom, defendant was lying on the floor in the hallway. Karina told defendant to leave. Defendant got up, grabbed Karina by her forearms, and threw her to the "ground." Karina knew what "was coming" once defendant threw her. Defendant, while punching Karina in the face, told her, "[D]on't you ever f*** do that to me again." Karina tried to punch defendant back, but defendant was on top of her and his knee pinned her right forearm to the ground.

¶ 10  After Karina was able to punch defendant, he got off of her. Defendant began to cry, and Karina went to her room. Defendant told Karina, "[I]f you really want me out, then take me out," before handing Karina a pocketknife. Karina told defendant that she did not want to fight with him anymore. She told him that she just wanted him to leave. Defendant did not leave. When defendant again tried to hand the knife to Karina, she "smacked it out of his hand" and headed for the bathroom. Defendant prevented Karina from closing the bathroom door and spit in her face. Karina told him that she was tired of "always having to fight to get his attention."

¶ 11  They heard a noise that sounded like A.B. fell off the bed, so they stopped fighting and went to check on her. A.B. was fine and still sleeping. Karina told defendant to move out of her way. She pushed his arm away. Defendant said, "[D]on't tell me what I can and cannot do with my kid." Karina responded, "[S]he's not yours, she's mine," because Karina cared for A.B. and "never left her side." At this point, Karina and defendant were whispering so they would not awaken A.B. After they left the bedroom, defendant asked, "[S]he's not mine?" Before Karina could respond, defendant began choking her. At the time, her back was against the wall as defendant's hands were around her neck. Defendant squeezed Karina's neck to the point that she was unable to breathe. Karina pushed her hand into defendant's face. He let go

of her neck but pushed her to the floor. Karina's face was to the floor when defendant got on top of her and started punching her again. Defendant climbed off Karina and started crying.

¶ 12　　　Karina got up off the floor and told defendant that she wanted nothing to do with him anymore and that "he needed to leave." Defendant "got mad" and punched Karina in the stomach, putting "his whole body into that punch." As he punched Karina, defendant said, "[Y]ou didn't want to have my baby, right? You stupid b***, you don't want to have my baby?" Karina knew that something was "not normal." She could not breathe and began to cry. She balled up on the couch. She thought defendant was going to hit her again, but he did not because she "started coughing." Defendant was "even scared" because Karina was coughing up "mucus" with bits that were "coming up red." Although defendant said, "I got to take you to the hospital," Karina had to ultimately beg him to take her there.

¶ 13　　　On the way to the hospital, defendant kept asking Karina what she was "going to tell them." Karina said that she would tell them "nothing," just that she "can't breathe." Defendant remained at Karina's side the whole time she was at the hospital, except for when she was having an ultrasound performed. A pregnancy test had come back positive, but no heartbeat was detected during the ultrasound. Karina did not tell the nurse what had happened to her because "[h]e was right there." Karina was very upset about not hearing a heartbeat and just wanted to go home. She went home with defendant.

¶ 14　　　The next day, Saturday, Karina was in pain and "couldn't really do much." Defendant cared for A.B. while Karina "was just kind of laying down the whole time." She started bleeding and cried. She showed defendant, and "he was like, we just have to hope."

¶ 15　　　On Sunday, Karina was still experiencing stomach pains and returned to the hospital. A friend had to drive her there because defendant was not at home and had the car. Karina and her friend took A.B. with them to the hospital. Before leaving, Karina's friend commented that Karina appeared pale. Karina told her friend that her "contractions" were worse. While Karina "called him and texted him all day," defendant did not return to the apartment, claiming that he would come back "soon or not yet."

¶ 16　　　At the hospital, a physician told Karina that her "pregnancy count was very low" and that she was going to prescribe "some medicine" for her. Karina cried because she "knew what that meant *** that there is no more baby." At that point, a physician asked Karina about what really happened to her, and Karina told her of the altercation. Karina spoke to a counselor and a police officer while at the hospital. The officer took photographs of Karina's injuries, which were admitted into evidence. The officer asked Karina to come to the Carpentersville police station on the following Monday so that more photographs could be taken of her in better lighting. Karina complied with that request, and in court she identified the photo taken at the police station. The photographs were subsequently published to the jury.

¶ 17　　　Karina described the injuries that were depicted in the photographs, which included bruises on her shoulders from being punched in the back; scratches, abrasions, and bruises on her neck from defendant choking her; bruises and abrasions on her arms from being punched and kneeled on; redness, bruising, and scratches on the left side of her face; a scratch and thumbnail mark on her neck from defendant's "long nails on that right side"; bruising and abrasions under her jawbone; bruising on one of her knees; a bruise on one of her legs; a bruise on the left side of her torso from defendant punching her; a black left eye and bruising on the left side of her face that extended all the way back underneath her hair; and a cut inside the top of the left ear

from being punched. Karina testified that defendant inflicted all the injuries depicted in the photographs.

¶ 18    Over defendant's objection, Karina was allowed to testify about the other acts of domestic violence defendant committed against her. On November 29, 2012, Karina and defendant argued about "a girl." Defendant told Karina, "I want to leave you." He then grabbed the keys and headed to the car. Karina grabbed defendant's "stuff" and threw it, saying, "[T]ake all your things with you." Defendant got out of the car, picked up his belongings, and went back inside. Defendant "punched or slapped" Karina. When she tried to call the police, defendant forced the phone out of her hand and broke it. Karina then called the police from a family member's phone.

¶ 19    Over defendant's objection, the trial court then admitted several photographs the police took of the injuries defendant inflicted on Karina during the November 29, 2012, incident. A photograph of the broken phone was also introduced into evidence. The photographs depicted bruises and scratches on Karina's face, bruising on her left chin and ear, bruising and redness on her neck, bruising on her arms, redness and puffing below her left eye, bruising on the back of her neck, a cut lip and a scratch on the left side of her face, and bruising on her left shoulder.

¶ 20    Karina reviewed a written statement she gave to the police after the November 29, 2012, incident in order to refresh her recollection. She remembered that her argument with defendant began when defendant accused Karina of talking "to another male, when in reality he was talking to another girl." Karina testified that she fought back and hit defendant during the incident.

¶ 21    The assistant state's attorney asked Karina, "That Sunday evening when you're in the hospital, do you know where Luis was?" The defense objected as to the relevance of this question but was overruled. The trial court stated, "It's a yes or no, do you know where he was." Karina responded, "I didn't know until another person came to the hospital. It was another one of my friends, and yes, she was the one who told me his location." The assistant state's attorney asked, "And where was he?" Karina responded, "He was at his friend's house because that was more important." The assistant state's attorney then asked, without objection, "And Karina, was he at his friend's house the whole night?" Karina replied, "No. Then he went to a strip club."

¶ 22    On cross-examination, Karina acknowledged that she felt that defendant was disrespecting her by adding girls to Facebook. She said that the argument during the May 27, 2016, car ride was verbal, not physical. She specified that defendant jumped out of the way when she was backing up, but she acknowledged that she might have accidently hit him. After A.B. was in bed, Karina said she yelled at defendant to "just get out." Karina also clarified that the blade on the pocketknife was out when defendant gave it to her, with the blade pointed at her. Karina acknowledged that she could have poked defendant's eyes when he was choking her as she was trying to fight back.

¶ 23    Karina also acknowledged that, when she was taken to have the ultrasound, defendant did not accompany her. She was alone with registered nurse Barbara Massie. Karina told Massie that she might be pregnant, although Karina had previously taken a home pregnancy test that provided a negative result. Karina said that she told Massie that she felt safe to go home. Karina admitted that, although she had not yet had an ultrasound, she knew that she had a miscarriage because she had one before. She also specified that she took the home pregnancy test because she was "feeling nauseous and stuff." When she was bleeding on Sunday, she was worried that

she was having a miscarriage. When Karina told defendant about the bleeding, he said, "Let's hope everything will be ok."

¶ 24    Massie testified that she treated Karina on May 28, 2016, at Sherman Hospital. Karina's major complaint was "abdominal pain and flank pain," meaning the region directly to the side and beneath the rib cage. Karina also complained of having a hard time breathing. Massie was concerned about the other "marks" on Karina, but it "wasn't an opportune time to question her about the injuries" because she had someone, a male, in the room with her. A pregnancy test on Karina came back positive. Massie described Karina as being "quiet, withdrawn, tearful, didn't make any eye contact." When Massie asked Karina how she got the injuries, Karina would not respond. She just said, "I'm okay, it's okay." Massie testified that the injuries she observed on Karina appeared to be fresh, probably inflicted "within a day." Although she was concerned about Karina's safety, Massie did not call the police. Since Karina did not admit to anything, Massie thought that calling the police might create further problems once Karina was discharged.

¶ 25    Physician assistant Imelda Sikowich testified that she treated Karina at Sherman Hospital on May 29, 2016, and that Karina complained of abdominal cramping and vaginal bleeding. Sikowich reviewed Karina's medical records from her visit on May 28, 2016, which showed a positive pregnancy test and noted some trauma that Karina did not want to talk about. Sikowich noticed bruising, which Karina did not want to discuss. The bruises were on both of Karina's arms, on her neck, on one of her flanks, and around her eyes. Eventually, Karina told Sikowich that "on Friday *** my boyfriend attacked me." She said that he had punched her on her face, abdomen, and back. Based on the test results on Karina's hormone levels, together with the bleeding and abdominal pain, Sikowich determined that Karina had suffered a miscarriage. Sikowich testified that there can be multiple causes of a miscarriage and that abdominal trauma is one of them.

¶ 26    Officer David Rowley of the Carpentersville Police Department testified that he spoke to Karina at Sherman Hospital on May 29, 2016. Karina expressed concern for her safety. She had a large bruise around her eyes, red marks around her neck and shoulder, and a very large bruise inside of her right arm. She was forthcoming with information about the incident. Karina supplied Rowley with a description of the vehicle defendant would be driving.

¶ 27    Officer Derek Neuman of the Carpentersville Police Department testified that he made contact with defendant on May 30, 2016, as defendant was exiting a vehicle. As soon as defendant confirmed that he was Luis Bustos, defendant said that "he wanted a lawyer and he also said something about coming back from the club." Officer Neuman did not observe any injuries to defendant's person.

¶ 28    The parties stipulated that defendant made a telephone call on May 30, 2016, and that People's Exhibit No. 25 (in the form of a CD) "is a full and fair recording of that call made by the defendant."[1] Portions of the call were in Spanish, and Detective Juan Cisneros of the Carpentersville Police Department, who is fluent in English and Spanish, listened to the recording. He testified that People's Exhibit No. 25A was an accurate transcript of the call. The portions of the call that were in Spanish were accurately translated into English in the

---

[1]Pursuant to the trial court's pretrial order, reference to the call being made from the jail was redacted.

transcript.[2] The recording was played for the jury, and a copy of the transcript was given to each juror. The trial court instructed the jury that the areas marked in yellow denoted the Spanish portions of the call. The trial court also instructed the jurors that, if they perceived a conflict between the recording and the transcript, the "recording controls."

¶ 29 Prior to playing the recording for the jury, the State introduced a certified copy of defendant's conviction of the domestic battery that occurred November 29, 2012. The trial court admitted the exhibit over defendant's objection.

¶ 30 Defendant includes the following portion of the call transcript in his opening brief:

"CALLER [(DEFENDANT)]: Karina hung up on me so earlier I just wanted to talk to [A.B.] She was telling me all that other stuff that I ain't even want to hear. So I

PERSON 2: [Y]eah bro.

CALLER: I talked to mom for a little minute and… [(inaudible)] … I don[']t know what the hell is going on. I guess she, um, Karina, talked with Sandra and she told her a different story.

PERSON 2: She did. She said that you were out on Friday night or that you beat her up on Friday[.]

CALLER: [U]hmhum[.]

PERSON 2: [Y]eah bro.

CALLER: [Y]ea well.

PERSON 2: I don't even know what is going on dude because you were with us that day on Friday.

CALLER: I know. Well me and her we were together on Friday. We went out.

PERSON 2: [Y]eah.

CALLER: And. But the whole time we were arguing. We went to the house you guys and when we were driving all the way back she's hitting me and hitting me yeah I'm just taking it we go somewhere else and we were fine. We leave we're getting out of the car, I'm getting out of the car she hit me with the car[.]

PERSON 2: Ah, she did.

CALLER: [Y]eah, and you know just went inside and she's still hitting me when I supposedly… [(inaudible)] and supposedly[.]

PERSON 2: [Y]ou should of called me.

CALLER: I—

PERSON 2: [Y]ou should of really called me. I would of gotten someone to pick you up.

CALLER: [Y]ah, well, I should of. I should of just left that was my fault I should of just left. Me too.

PERSON 2: [Y]eah, I know.

_____

[2]The transcript contained bracketed portions of dialogue that were translated from Spanish to English.

CALLER: You know and supposedly when I hit her and all that happened it turns out she was pregnant and she went to the hospital when I took her to the hospital. And I don't know, I guess she lost the baby or whatnot[.]"

¶ 31 The transcript of the call is eight pages in length and contains additional references to the incident that led to defendant's arrest. Early in the call, defendant was asked, "[A]lright, hey what happened?" Defendant said, "[Y]eah I just got over here like two hours ago *** so I don't even know." Person 2 then told defendant, "Don't worry bro its gonna pass. See I told you that day to stay at the house." Defendant responded, "I did." Person 2 again said, "[Y]ou should of stayed dude." Defendant responded, "Yeah, but you know. I should have never went back with her in the first place. I should of just stayed." Defendant then repeated several more times that he "should have just stayed."

¶ 32 Next, there was conversation regarding defendant's belongings, getting access to defendant's "gmail account," and "the car." Then, the exchange quoted by defendant took place.

¶ 33 The conversation continued with defendant telling Person 2 that he was not sure whether Karina was pregnant and that he did not see any papers so he did not know "if it's true." Person 2 asked defendant, "What if she wants you to get more time." Defendant responded, "[S]top," so he could finish what he was saying. The conversation continued as follows:

"CALLER [(DEFENDANT)]: [W]hen we went to the hospital, when we were at the hospital yesterday, when she went yesterday. When we went the same night Saturday morning. You know Friday night, whatever[.]

PERSON 2: [Y]eah.

CALLER: (inaudible) blood sample and they told her there that she was pregnant. They did an ultrasound and they told her she was pregnant.

PERSON 2: [A]lright.

CALLER: Right there and then they did not give any papers besides other things were [sic] she was hurt but that was all[.]

PERSON 2: [Y]eah.

CALLER: [S]o truthfully I don't know."

¶ 34 Defendant and Person 2 then discussed "the car" and phone numbers for various people. Defendant gave Person 2 his Gmail and Facebook passwords. Defendant finally told Person 2 that he would try to "call you guys again tomorrow."

¶ 35 After the phone call was played for the jury, the transcripts were collected and the State rested its case. Defendant's motion for a directed verdict was denied.

¶ 36 Defendant elected to testify on his own behalf. His testimony regarding the activities on May 27, 2016, was largely consistent with Karina's testimony. Defendant acknowledged that Karina complained about him "adding females on [F]acebook" while they were visiting relatives at his father's house in Belvidere. On the drive back from Belvidere to Carpentersville, defendant testified that Karina complained about a "lack of trust" between them. Defendant testified that he told her "we'll talk about it later." Karina was "upset, angry, [and] aggressive." They decided to go to a friend's house instead of going home. Defendant testified that things were "calm" at the friend's house because they "spoke about our issues prior to leaving to [sic] [the] friend's house." Karina then became angry again, over "the same situation" that they had argued about earlier, so she asked to leave. On the way home, the

argument was "verbal." Defendant said it turned "physical after I got hit with the car." Karina had parked the car and told defendant, "[E]ither you leave or I leave." Defendant told her that he would leave. Defendant said that, as he was "halfway" out the door in the process of getting out, Karina put the car in reverse and backed out of the parking space, and the door hit him. Defendant testified that he "rolled underneath." He said that "it hurt" and that he felt a big pain in his "upper left chest side on the bottom." Defendant was on the ground with the car's lights on him. He said he was "shocked" and "scared, I guess, being hit with the car." After Karina pulled back in and parked, defendant got up, removed A.B. from the backseat, and walked toward the apartment.

¶ 37    Defendant testified that, after he and Karina tucked A.B. in, he laid down in the hallway because he felt pain. Two minutes later, Karina came out of A.B.'s bedroom and kicked him, saying, "Why are you still here? Just get out." Defendant claimed that Karina "repeatedly" kicked him in the same area where he was hit by the car. Defendant said that he tried to calm Karina down and tried to go to another room, but Karina followed him. He said that he tried to avoid the situation. Defendant said that he was afraid for his own safety and felt that Karina was going to "hurt" him. He said that Karina "initially" stopped but then pushed him.

¶ 38    Defendant felt that he needed to restrain Karina "because she was starting to throw punches." He grabbed Karina by her upper arms, but she was still trying to punch him. Defendant said that he held Karina while she attempted to punch him when they "tripped over something" and they both fell forward. They fell on his right side and her left side. Karina was "like face front to the ground." Defendant said that Karina's back was to the floor and he landed on top of her. He said that he got off of her, as she had asked, and they got away from each other. Defendant said that Karina scratched his arms bad and "like near my cheek. That's about it."

¶ 39    Defendant denied punching Karina in the stomach and denied saying, "[Y]ou don't want to be pregnant." Defendant admitted that, about two weeks before the May 27 incident, Karina told him that she had missed her period, so she took a home pregnancy test, which was negative. Defendant also denied showing Karina a pocketknife and saying to Karina, "[Y]ou have to take me out." Defendant testified that Karina was not wearing her glasses on May 27 because A.B. accidently broke them about two months prior.

¶ 40    Defendant said that the fight ended when Karina laid down on the sofa and "said she felt pain." Defendant denied seeing any blood that Karina coughed up. Defendant denied saying anything to Karina about "not saying anything about [*sic*] fight." Defendant knew that Karina had miscarried before.

¶ 41    Defendant testified that when he was arrested by Officer Neuman he had a scratch on the left side of his face, scratches on his arms, and slight bruises on the left side of his upper body—all purportedly caused by Karina on May 27. Defendant said that the police never asked him about his injuries but that he told the police he had "injuries too." The police made no attempt to photograph those injuries.

¶ 42    Defendant acknowledged that, as Karina testified, he cried during the fights because of the pain "physically and emotionally-wise" of constantly arguing with one another about "trust issues."

¶ 43    Defendant testified that he was arrested at 3 a.m. on May 30. He said that the only physical contact he made with Karina was "to restrain her." Defendant denied choking Karina "at any time."

¶ 44    On cross-examination, defendant stated that the car was going fast when it hit him. When asked, "[S]he gunned the gas in reverse and then hit you?" defendant answered, "Yes." Defendant testified that he was in so much pain afterwards that he could not talk. Despite being in pain "he gradually made it to the apartment" while carrying A.B. Despite being in fear of Karina, defendant did not call the police once A.B. was in bed. Instead, he "laid down in the hallway." After things calmed down, defendant did not feel the need to go to the hospital, but he "decided to take Karina to the hospital." Defendant told Officer Neuman that he had injuries but did not specify where they were because "he didn't ask." Defendant denied putting his hands on Karina's neck "at any time," denied putting his knees on her forearm, and denied punching her in the face. Defendant then said that he might have "accidently" touched Karina's neck when they fell but that he could not recall how he might have touched her neck.

¶ 45    On redirect examination, defendant explained that he did not report getting hit by the car to the police because "when [he] first got arrested [he] told them [he] wanted a lawyer." He also did not want Karina to be arrested.

¶ 46    On recross-examination, defendant testified that while at the police station he told the police that he had injuries. He also stated that Karina hit him in the car on the drive from Belvidere to Carpentersville. When asked about his testimony on direct that the physical altercation started with her hitting him with the car, he said he "wasn't asked if on the drive back." Defendant said that his testimony now was that Karina hit him "on the drive from Belvidere."

¶ 47    At the conclusion of defendant's testimony, the State introduced in rebuttal certified copies of defendant's convictions of attempted home invasion, aggravated fleeing or attempting to allude a peace officer, and felony possession of a firearm without a firearm owner's identification (FOID) card. Over defendant's objection, the trial court admitted both documents pursuant to *People v. Montgomery*, 47 Ill. 2d 510 (1971). The convictions were read into the record in the presence of the jury, after which the State rested its rebuttal case.

¶ 48    During closing arguments, defense counsel argued that Karina's testimony regarding the "sequence of events" was not credible. Counsel pointed out that at the hospital, when she was with Massie, Karina was given "a chance to speak, but she didn't." Counsel argued that Karina lied to Sikowich about her medical history when she said she had not had any miscarriages in the past. Defense counsel argued that, in the recording of the phone call, defendant was telling the truth when he said, "[Karina] was still hitting me." Counsel argued that defendant and Karina loved each other but have an "unhealthy way to resolve their conflict." Counsel argued that Karina had a motive to report defendant to the police because she was "angry," jealous, and being disrespected. Counsel argued that defendant might not be the best boyfriend but that "in this case [Karina] hit him first. She hit him with the car. In the apartment she did not let go." Counsel argued that defendant was trying to defend himself and calm Karina down.

¶ 49    During rebuttal argument, the State argued that Karina had been consistent in her description of events since May 2016. The State pointed out that, during the phone recording, Person 2 said that Karina "said that [she and defendant] were out on Friday and that [defendant] beat her up on Friday." The State argued that, while at the hospital the first night, Karina did not tell anyone what happened because she could not compose herself and "was afraid."

¶ 50    On the other hand, the State argued that defendant's version of events was incredible. The State discussed defendant's prior felony convictions and the court's instructions, commenting:

"And, ladies and gentlemen, when we're talking about the Defendant's credibility, you're going to get an instruction from the judge that talks about that. You heard those two certified convictions I admitted in our rebuttal case, and you get to consider those, ladies and gentlemen, when—as to how it impacts his credibility."

¶ 51   The State argued that, unlike defendant, Karina was not impeached and was "completely consistent." The State urged the jury to reject the defense's argument that Karina "cooked" up this story "over what, a day and a half later, because [she was] mad that he went out with his friends." The State argued that defendant's story did not explain the injuries depicted in the photographs. The State argued that defendant "told us on that phone call" that he hit Karina.

¶ 52   The State told the jury that they would receive an instruction from the judge regarding the "prior" in 2012, stating, "You get to consider that for two things: The [d]efendant's propensity to commit acts of domestic violence, and his *modus operandi*." The State argued that the evidence showed that the violence "escalated. All of a sudden in 2016 he's not just slapping her, he's punching her, he's strangling her."

¶ 53   During final instructions, the trial court gave defendant's instruction No. 11, based on Illinois Pattern Jury Instructions, Criminal, No. 3.13 (approved Oct. 17, 2014) (hereinafter IPI Criminal No. 3.13), which stated: "Evidence of a defendant's previous conviction of an offense may be considered by you only as it may affect his believability as a witness and must not be considered by you as evidence of his guilt of the offense with which he is charged."

¶ 54   The trial court also gave the State's instruction No. 15, based on Illinois Pattern Jury Instructions, Criminal, No. 3.14 (approved Oct. 17, 2014) (hereinafter IPI Criminal No. 3.14), which stated:

"Evidence has been received that the defendant has been involved in offenses other than those charged in the indictment.

This evidence has been received on the issue of defendant's propensity to commit acts of domestic violence and *modus operandi* and may be considered by you only for those limited purposes.

It is for you to determine whether the defendant was involved in those offenses and if so, what weight should be given to this evidence on the issue of defendant's propensity to commit acts of domestic violence and *modus operandi*."

¶ 55   The trial court also gave the State's instruction No. 2, based on paragraph seven of Illinois Pattern Jury Instructions, Criminal, No. 1.01 (approved July 18, 2014) (hereinafter IPI Criminal No. 1.01), which stated: "Any evidence that was received for a limited purpose should not be considered by you for any other purpose."

¶ 56   The parties agreed with the trial court that the jury should be allowed to see the 2012 domestic battery plea of guilty form but not the convictions introduced in the State's case in rebuttal.

¶ 57   During deliberations, the jury requested a definition of "great bodily harm." The parties agreed to respond by telling the jury that they had all the instructions and to continue to deliberate. The jury convicted defendant of two counts of aggravated domestic battery (counts I and II) and two counts of domestic battery (counts IV and V). However, the jury found defendant not guilty of aggravated domestic battery (great bodily harm) (count III) based upon striking Karina and causing her to miscarry.

¶ 58        Defendant filed a posttrial motion challenging the trial court's rulings on the motion *in limine*, allowing the admission of defendant's prior felony convictions for impeachment purposes as well as "[d]efendant's prior conviction of 12 CM 5176, Domestic Battery (Kane County) through Complaining Witness, Karina Estrada's testimony and photos at trial." Defendant challenged the trial court's ruling on the admissibility of the recording of the telephone conversation between defendant and Person 2 and also challenged the trial court's "overruling Defense's objection" to evidence of defendant's whereabouts during Karina's May 29, 2016, visit to the hospital. The trial court denied defendant's motion, and the case proceeded to sentencing.

¶ 59        Karina testified for the State. She discussed the impact defendant's crimes had on her and A.B. Karina testified that she suffered both physically and psychologically. On cross-examination, Karina explained that what bothers her the most is the impact on her daughter.

¶ 60        Carpentersville police officer Erik Quandee testified that, in April 2009, he investigated a shooting involving a minivan that was struck by three bullets. Officer Quandee interviewed defendant. Defendant told him that the shooting was "gang related." Defendant explained that he was the shooter. Defendant said that he had the gun for "about a week-and-a-half" prior to the shooting. The person he shot at was inside the minivan along with other passengers. The shooting occurred outside a grocery store at 10:50 a.m. Over defendant's objection, the State presented expert testimony that defendant is a member of the Latin Kings street gang.

¶ 61        Defendant's mother and his sister testified in mitigation, stating that defendant is a good son and brother. The defense introduced a letter from defendant's brother showing the love and support for defendant from his family.

¶ 62        The State argued that the facts of the case, together with defendant's history of delinquency or criminal activity, justified a sentence of 10 years in prison. The State argued that Karina had to live through the trauma of losing a child. The State noted that, in the 2013 gang-related attempted home invasion, defendant was armed with a knife. "At the time, his daughter, who he was supposedly so concerned about, was a year-and-a-half." Defendant was on parole for that offense when he committed the instant offense. The State argued that none of the statutory factors in mitigation applied. With respect to the factor that "defendant's criminal conduct neither caused nor threatened serious physical harm" (730 ILCS 5/5-5-3.1(a)(1) (West 2016)), the State argued that defendant caused Karina to miscarry and that Karina testified "about that experience." The State also asked the trial court to consider the photographs of Karina's injuries from both the 2012 and 2016 beatings. The defense objected "because those are elements of the crime." After reviewing the photographs, the trial court overruled the objection.

¶ 63        The defense argued for the imposition of the minimum sentence of three years. Defense counsel noted that defendant was a good father to A.B. and that, if he and Karina "are going to maintain their relationship, it is better for Mr. Bustos to get counseling, learn his way, and support the young mother and the young child."

¶ 64        Defendant elected to make a statement in allocution. The trial court told defendant that he had the right to make a statement but that he did not have to say anything. Defendant acknowledged as much and said that he decided on his own to make a statement and that no one forced, coerced, or promised him anything "to get up and make this statement." Defendant began by asking "mercy from the court to receive forgiveness from all parties." Defendant asked for forgiveness from his family, "especially Karina and our daughter [A.B.] for actions that take me away from my loved ones." Defendant stated that "I have the guilt of knowing

that I made wrong choices by have [*sic*] confidence to do better. I accept responsibility for my actions and I ask for mercy." Defendant continued, "Instead of thinking through and acting on it, I decide to respond for the moment, to see what is at hand and not what I want in the long run." Defendant said that he accepted "responsibility" for his actions and "for all I caused."

¶ 65 The trial court commented that, upon reviewing the factors in mitigation, it could not say that any of them applied. Regarding factors in aggravation, the court found that defendant's conduct "caused or threatened serious harm." The court noted that defendant was convicted of "aggravated domestic battery, alleging that he strangled the victim by intentionally impeding the normal breathing of the victim." The court also noted that it "considered the trial exhibits which were admitted at this sentencing hearing over the defendant's objection." The court found that "the conduct of impeding the breathing of the victim is serious harm." The court found that defendant had a history of prior delinquency and criminal activity. The court also considered defendant's gang membership and involvement in what is "essentially a crime industry." The court found that the necessity to deter others also applied. *Id.* § 5-5-3.2(a)(7). The court also considered the effect the sentence would have on A.B., finding that she "[would] not be adversely affected." The court stated that the State's recommendation of 10 years was not "an unreasonable request." The court commented that, during the sentencing hearing, defendant "indicated on more than one occasion as he made his statement that he is accepting responsibility for his conduct, responsibility for his actions. And the Court has considered that." The court found that count II merged into count I. On count I, the court imposed a sentence of eight years in the Illinois Department of Corrections followed by four years of mandatory supervised release. The State noted that on the remaining counts the maximum is six years. The court, with the parties' agreement, merged the remaining counts into count I, on which the sentence was imposed. Defendant's motion to reconsider the sentence was denied. Defendant timely appealed.

¶ 66                                    II. ANALYSIS

¶ 67 On appeal, defendant makes the following arguments: (1) that testimony about defendant being at a strip club while Karina was at the hospital was irrelevant and prejudicial; (2) that during jury selection the trial court violated Illinois Supreme Court Rule 431(b) (eff. July 1, 2012); (3) that trial counsel was ineffective for failing to object to testimony that defendant invoked his right to counsel, failing to object to improper closing arguments by the State, and failing to ensure that the jury was properly instructed on the use of defendant's prior convictions; (4) that the cumulative effect of these errors deprived defendant of a fair trial; and (5) that the trial court's consideration of a factor inherent in the offense requires a remand for resentencing. We consider each argument in turn.

¶ 68                              A. Strip Club Testimony

¶ 69 Defendant first argues that the trial court erred by allowing Karina's testimony that defendant was at a strip club while she was in the hospital on Sunday, May 29, 2016. He argues that this evidence was irrelevant and prejudicial. Furthermore, defendant contends that this "issue has been preserved for review as defense counsel objected at trial and included this issue in a post-trial motion." The State responds by arguing that this issue has been forfeited because, contrary to defendant's claim, trial counsel did not object to the question that elicited the "strip

club" response. Further, the State argues that this issue is not reviewable under the plain-error rule because the evidence was not closely balanced. We agree with the State on both points.

¶ 70    The testimony at issue occurred during the following exchange between the assistant state's attorney and Karina:

"STATE: That Sunday evening when you're in the hospital, do you know where Luis was?

DEFENSE COUNSEL: Objection.

THE COURT: Overruled.

DEFENSE COUNSEL: Relevance.

THE COURT: It's a yes or no, do you know where he was.

KARINA: I didn't know until another person came in the hospital. It was another one of my friends, and yes, she was the one that told me his location.

STATE: And where was he?

KARINA: He was at a friend's house because that was more important.

STATE: And, Karina, was he at his friend's house that whole night?

KARINA: No. Then he went to a strip club."

¶ 71    In his reply brief, defendant cites *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007), to argue that, even if not preserved, this issue "is reviewable under the closely-balanced prong of plain error review because, as argued in Mr. Bustos' opening brief, the evidence was not overwhelming."

¶ 72    Defendant notes that he objected, on the grounds of relevance, to the question, "That Sunday evening when you're in the hospital, do you know where Luis was?" He argues that this objection preserved the issue for review because that question was "closely related" to the second and third questions in the exchange. We disagree. First, defendant's objection was that the question was not relevant, not that the prejudicial effect substantially outweighed the probative value. A trial court's decision regarding the admissibility of evidence is within its sound discretion and will not be disturbed on appeal absent an abuse of discretion. *People v. Becker*, 239 Ill. 2d 215, 234 (2010). An abuse of discretion occurs when the trial court's ruling is arbitrary, fanciful, or unreasonable or where no reasonable person would agree with the position adopted by the trial court. *Id.* (citing *People v. Illgen*, 145 Ill. 2d 353, 364 (1991)). " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). Evidence is relevant if its purpose is to provide context for other evidence. *People v. Hanson*, 238 Ill. 2d 74, 101 (2010).

¶ 73    Here, Karina's knowledge of the defendant's whereabouts provided context for her decision to disclose the true source of her injuries. The State's theory was that Karina did not disclose the source of her injuries when she was first in the hospital because defendant was with her, except when she was given the ultrasound, and she was afraid of him. The trial court's ruling was limited to allowing her to answer the question "yes or no." The trial court did not address the relevance of where defendant actually was, and thus it was necessary for defendant to continue to object in order to preserve the issue. An "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and *** a timely objection or motion to strike appears of record, stating the specific ground of

objection, if the specific ground was not apparent from the context." Ill. R. Evid. 103(a)(1) (eff. Oct. 15, 2015).

¶ 74 Based on defendant's forfeiture of the issue, we are limited to conducting a plain-error analysis. "The plain-error rule bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved claims of error in specific circumstances." *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). Reviewing courts apply the plain-error doctrine when:

> "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Piatkowski*, 225 Ill. 2d at 565.

¶ 75 In *Thompson*, 238 Ill. 2d at 613-14, our supreme court reaffirmed that the second prong of plain-error analysis is limited to structural errors. Defendant argues that the claimed error regarding the "strip club" testimony is reviewable under the closely balanced prong of plain-error review. The State argues that defendant did not request plain-error review in his opening brief. In his reply brief, defendant points out that our supreme court has made clear that plain error may be raised by a defendant for the first time in his or her reply brief. *People v. Williams*, 193 Ill. 2d 306, 347-48 (2000).

¶ 76 Under the first prong of plain-error review, the defendant has the burden to show that a clear or obvious error occurred and that the evidence was closely balanced. *People v. Herron*, 215 Ill. 2d 167, 187 (2005). While the defendant has the burden to show that the evidence is closely balanced, he has "no burden to present any evidence or to testify himself at trial." *Piatkowski*, 225 Ill. 2d at 567.

¶ 77 The first step in plain-error review is to determine whether an error occurred. *Thompson*, 238 Ill. 2d at 613. Defendant notes that, in denying defendant's posttrial motion, the trial court found that evidence of defendant's whereabouts during Karina's second trip to the hospital was relevant to show how Karina got to the hospital and who was present during the examination. As we have noted, Karina's knowledge of defendant's whereabouts provided context for her disclosures to the medical personnel and the police; however, we discern no relevance to the fact that defendant was at a strip club. As defendant notes in his reply brief, "the State did not use this evidence in closing to explain the delay in reporting. Instead, the prosecutor argued to the jury that Bustos' presence at the strip club showed that he did not love his family." For purposes of our review, we conclude that defendant has shown that a clear or obvious error occurred.

¶ 78 Next, defendant must show that the evidence was closely balanced, *i.e.*, that "the error alone severely threatened to tip the scales of justice." *People v. Sebby*, 2017 IL 119445, ¶ 51. Evidence has been found to be closely balanced where there are two opposing versions of events and there is "no extrinsic evidence *** presented to corroborate or contradict either version." *People v. Naylor*, 229 Ill. 2d 584, 607 (2008). "In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *Sebby*, 2017 IL 119445, ¶ 53. Our "inquiry involves an assessment of the evidence on the elements of the charged offense or offenses, along with any evidence regarding the witnesses' credibility." *Id.*

¶ 79    There is no issue in this case as to who caused the injuries that Karina suffered during the altercation. Since the State's evidence did not contain any evidence of self-defense, defendant had to present some evidence that his use of force was justified in order to be entitled to a self-defense instruction. Defendant failed to meet that threshold. *People v. Cox*, 100 Ill. App. 3d 272, 281 (1981) (a defense of "justifiable use of force" is an affirmative defense); 720 ILCS 5/7-14 (West 2016). Karina's testimony was corroborated in virtually every detail. Her account of the assault was consistent with the photographs and the testimony of the medical teams that treated her. Karina's injuries are inconsistent with defendant's testimony that he did not strangle or punch Karina. The photographs, simply put, show that she was beaten. The marks and bruising on Karina's neck, including the fingernail gouge mark, could not have resulted from the fall defendant described. We note that defendant's testimony on direct examination was that the argument on the way home was "verbal," whereas in the recorded call defendant said, "she's hitting me," and then on recross-examination he again said that Karina was hitting him in the car on the drive from Belvidere.

¶ 80    During the phone call, Person 2 told defendant that Karina "said that you were out on Friday night or that you beat her up on Friday." Defendant responded by saying, "[U]hmhum." Person 2 said, "[Y]eah bro," and defendant responded, "[Y]ea well." While defendant went on to describe Karina as the instigator, defendant's admission that he "beat her up" is strong corroborating evidence of Karina's testimony.

> " 'When a statement that is incriminating in nature is made in the presence and hearing of an accused and such statement is not denied, contradicted, or objected to by him, both the statement and the fact of his failure to deny it are admissible in a criminal trial as evidence of the defendant's agreement in its truth.' " *People v. Colon*, 2018 IL App (1st) 160120, ¶ 17 (quoting *People v. Soto*, 342 Ill. App. 3d 1005, 1013 (2003)).

See Ill. R. Evid. 801(a)(2) (eff. Oct. 15, 2015). We disagree with defendant's argument that the trial was a "credibility contest" between him and Karina. Although there were opposing versions of events, extrinsic evidence corroborated Karina's version. That same evidence contradicted defendant's version. The State also presented evidence of the 2012 incident where defendant beat up Karina and ultimately pled guilty to domestic battery. Evidence that a defendant has been involved in a similar incident is persuasive evidence that "the present victim is worthy of belief." *People v. Dabbs*, 239 Ill. 2d 277, 293 (2010). On the issue of credibility, defendant's testimony was also impeached with his prior felony convictions. In sum, the evidence in this case was anything but closely balanced.

¶ 81                              B. Illinois Supreme Court Rule 431(b)

¶ 82    Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) was designed to ensure that the defendant has a fair and impartial jury that understands and accepts four important constitutional principles, first laid out in *People v. Zehr*, 103 Ill. 2d 472 (1984) (codified in Ill. S. Ct. R. 431(b) (eff. May 1, 1997)):

> "(1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her." Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

Rule 431(b) requires that the trial court "ask each potential juror, individually or in a group, whether that juror understands and accepts" each of the principles. *Id.*

¶ 83 The trial court in the instant case failed to ask each potential juror either individually or collectively whether they understood and accepted the *Zehr* principles. Defendant concedes that this error was not preserved but argues that the issue is reviewable under the first prong of the plain-error rule. In *Thompson*, 238 Ill. 2d at 611, our supreme court held that, in the absence of any evidence that the defendant was tried by a biased jury, a trial court's violation of Rule 431(b) "does not fall within the very limited category of structural errors and, thus, does not require automatic reversal of defendant's conviction." As we have found, the evidence in this case was not closely balanced. We therefore honor the forfeiture of the issue.

¶ 84                                C. Ineffective Assistance of Counsel

¶ 85 Defendant argues that trial counsel provided ineffective assistance. Defendant cites three reasons why counsel's performance was deficient. First, counsel did not object to evidence that defendant invoked his right to counsel when he was arrested, and counsel compounded this error by having defendant repeat this fact during his own testimony. Second, counsel did not object when, during closing arguments, the State treated as substantive evidence a portion of the phone call that defendant claims was admitted merely to provide context to defendant's statements. Third, counsel did not offer a jury instruction that "specified which convictions could be used for which purposes."

¶ 86 To prevail on a claim of ineffective assistance of counsel, the defendant must show both that counsel's performance " 'fell below an objective standard of reasonableness' " and that counsel's deficient performance prejudiced the defense. *People v. Hodges*, 234 Ill. 2d 1, 17 (2009) (quoting *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984)). The defendant "must overcome the strong presumption that counsel's action or inaction was the result of sound trial strategy." *People v. Perry*, 224 Ill. 2d 312, 341-42 (2007). Matters of trial strategy may not form the basis of an ineffective-assistance claim. *People v. Patterson*, 217 Ill. 2d 407, 442 (2005). The defendant must "show that counsel's errors were so serious, and his performance so deficient, that he did not function as the 'counsel' guaranteed by the sixth amendment." *Perry*, 224 Ill. 2d at 342. When examining a claim of ineffective assistance of counsel, the issue "is always to be determined from the totality of counsel's conduct." *People v. Mitchell*, 105 Ill. 2d 1, 15 (1984).

¶ 87 In order to meet his burden under the prejudice prong, the defendant must "prove there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Perry*, 224 Ill. 2d at 342 (citing *People v. Johnson*, 218 Ill. 2d 125, 143-44 (2005)). The prejudice prong requires a showing of actual prejudice, not simply speculation that the defendant might have been prejudiced. *People v. Bew*, 228 Ill. 2d 122, 135 (2008). Furthermore, a reasonable probability is defined as a showing sufficient to undermine confidence in the outcome, rendering the result unreliable or fundamentally unfair. *People v. Evans*, 209 Ill. 2d 194, 220 (2004). Where, as here, a claim of ineffective assistance of counsel is raised for the first time on appeal, our review is *de novo*. *People v. Lofton*, 2015 IL App (2d) 130135, ¶ 24.

¶ 88                              1. Invocation of the Right to Counsel

¶ 89     Here, trial counsel did not object to Officer Neuman's testimony regarding defendant's statement that, when Officer Neuman first encountered defendant, defendant said that "he wanted a lawyer." Defendant argues that counsel "performed deficiently by not objecting to this evidence, either immediately or at a sidebar outside the presence of the jury." "[B]oth the right to remain silent and the right to an attorney are guaranteed under *Miranda*." *People v. Lucas*, 132 Ill. 2d 399, 432 (1989); see *Miranda v. Arizona*, 384 U.S. 436 (1966). "[T]he Illinois evidentiary rule generally prohibits impeachment of a criminal defendant with his postarrest silence, regardless of whether it occurred before or after he was given *Miranda* warnings, because under those circumstances, that silence is not considered relevant or material." *People v. Quinonez*, 2011 IL App (1st) 092333, ¶ 27. As defendant points out, there are exceptions to this rule: (1) when the defendant testifies at trial that he made an exculpatory statement to the police at the time of his arrest and (2) when he makes a postarrest statement that is inconsistent with his exculpatory trial testimony. Neither of these exceptions apply here; thus, if counsel had objected, the objection likely would have been sustained and the jury would have been instructed to disregard. However, matters of trial strategy may not form the basis of a claim of ineffective assistance "*unless* the strategy was unsound." (Emphasis in original.) *People v. Ramey*, 152 Ill. 2d 41, 54 (1992). Reviewing courts must be "highly deferential to trial counsel on matters of trial strategy, making every effort to evaluate counsel's performance from his perspective at the time, rather than through the lens of hindsight." *Perry*, 224 Ill. 2d at 344 (citing *People v. Madej*, 177 Ill. 2d 116, 157 (1997)).

¶ 90     Defendant has not carried his burden of establishing that trial counsel's failure to object was not a matter of trial strategy. An objection and an instruction from the court would have drawn more attention to the fact that defendant requested counsel. See *Lucas*, 132 Ill. 2d at 431. Also, defendant's decision to request counsel provided part of his explanation for why he did not report to the police that Karina hit him with the car. We also note that the two references to defendant's request for counsel were isolated and were not elicited to raise a guilty inference. No mention was made, during closing argument, of defendant's requests for counsel. *People v. Leak*, 398 Ill. App. 3d 798, 820-21 (2010); *Lucas*, 132 Ill. 2d at 433. Even if we were to conclude that counsel's failure to object was not the product of sound trial strategy, based on these facts and the overwhelming evidence of defendant's guilt, defendant has not shown a reasonable probability that the result of the trial would have been different. See *Lucas*, 132 Ill. 2d at 433 (testimony that defendant requested an attorney was harmless error).

¶ 91                              2. Closing Argument

¶ 92     Defendant argues that trial counsel's performance was deficient because counsel did not object to improper closing arguments by the State. During rebuttal argument, the State argued that Karina's version of events was consistent. The State referenced the recorded telephone call. Defendant cites the following passage from the State's rebuttal argument:

"Well, let's talk about how many times Karina Estrada has told her story. She told it to you yesterday. She told it to Imelda Sikowich. She told Imelda that her boyfriend beat her up.

And, ladies and gentlemen, remember that phone call I played for you? Remember when the other male talks about what Karina was saying? She said—the caller or the other person says—defendant says, Karina told her a different story. And the person on

- 18 -

the other end of the phone call says she did. *She said that you were out on Friday and that you beat her up on Friday.*

So, ladies and gentlemen, Karina Estrada's story hasn't changed from May of 2016. It's the exact same story. There's no difference here." (Emphasis added.)

Defendant argues that the State's use of Person 2's statement that Karina had said "you were out on Friday and that you beat her up on Friday" was improper because what Person 2 said was hearsay and was admitted "merely to provide context" for what defendant said. Defendant does not provide a citation to the record where any such ruling was made by the trial court. During argument on the State's motion *in limine* to admit the recording and the transcript, the State argued that the entire call should be admitted as an admission. The trial court admitted the recording over defendant's objection but redacted the four lines indicating that the call came from the jail. As we have already concluded, Person 2's statements, which were not contradicted or denied by defendant, are defendant's tacit admissions. Therefore, the State's use of the statements as substantive evidence was proper.

¶ 93    We also note that the State's remarks about Karina's consistency were in rebuttal to trial counsel's argument that Karina had a chance to "clarify what those marks were and what is happening [when] Nurse Massie asked her what happened. She said I'm fine. I'm okay." Counsel then implied that Karina became angry because defendant was "having fun at a friend's house" while she was in pain and then she decided to tell the police that defendant beat her. Because there was nothing improper about the State's rebuttal argument, defendant cannot show deficient performance.

¶ 94                              3. Jury Instructions

¶ 95    Defendant argues that trial counsel's performance was deficient because counsel did not submit "specifically-tailored" (modified) versions of IPI Criminal Nos. 3.13 and 3.14. Defendant contends that "the jury instructions here did not convey which prior convictions could be used for propensity and which could be used for a more limited purpose," meaning impeachment. Citing *People v. Stanko*, 402 Ill. 558, 561 (1949), defendant argues that the jury was given "two conflicting instructions" and that "there is no way to know if the jury followed the correct instruction or the erroneous one." With respect to prejudice, defendant argues, as he does throughout his brief, that the "case turned on the credibility contest" between himself and Karina and that the "cumulative effect of all of counsel's errors affected the jury's credibility determination."

¶ 96    The State responds by arguing that, generally, counsel's decision whether to request a limiting instruction can be viewed as strategic, citing *People v. Perez*, 2012 IL App (2d) 100865, ¶ 66. The State points out that the correctness of a jury instruction does not depend upon whether counsel can imagine a problematic meaning but whether an ordinary person acting as a juror would fail to understand the instruction. *Herron*, 215 Ill. 2d at 187-88. The State also argues that its rebuttal argument clearly conveyed to the jury how to use the prior convictions.

¶ 97    The purpose of jury instructions is to convey to the jurors the law that applies to the facts so that they can reach a correct conclusion. *People v. Hopp*, 209 Ill. 2d 1, 8 (2004). Illinois Supreme Court Rule 451(a) (eff. Apr. 8, 2013) requires that, "if the court determines the jury should be instructed on a subject, and the Illinois Pattern Jury Instruction (IPI), Criminal, contains an appliable instruction, then the IPI instruction 'shall' be given unless the court

determines it does not accurately state the law." *Hopp*, 209 Ill. 2d at 7 (citing *People v. Novak*, 163 Ill. 2d 93, 116 (1994)). Our task is to determine "whether the instructions, considered together, fully and fairly announce the law applicable to the theories of the State and the defense." *People v. Mohr*, 228 Ill. 2d 53, 65 (2008). "Jury instructions should be construed as a whole, rather than read in isolation." *People v. Parker*, 223 Ill. 2d 494, 501 (2006).

¶ 98     In determining whether the failure to give a written instruction deprived defendant of a fair trial, we "must look to all the circumstances to determine whether defendant received a fair trial, 'including all the instructions to the jury, the arguments of counsel, whether the weight of the evidence was overwhelming, and other relevant factors.' " *People v. Layhew*, 139 Ill. 2d 476, 486 (1990) (quoting *Kentucky v. Whorton*, 441 U.S. 786, 789 (1979) (*per curiam*) (failure to give written instruction on a burden of proof and presumption of innocence was not reversible error)). Failure to request a particular jury instruction "may be grounds for finding ineffective assistance of counsel if the instruction was so critical to the defense that its omission ' "den[ied] the right of the accused to a fair trial." ' " *People v. Falco*, 2014 IL App (1st) 111797, ¶ 16 (quoting *People v. Johnson*, 385 Ill. App. 3d 585, 599 (2008), quoting *People v. Pegram*, 124 Ill. 2d 166, 174 (1988)). We review *de novo* the issue of whether the jury instructions accurately conveyed the applicable law. *Parker*, 223 Ill. 2d at 501.

¶ 99     Defendant relies on *People v. Johnson*, 2013 IL App (2d) 110535, for his argument that trial counsel was ineffective for failing to submit tailored instructions regarding how the jury could use defendant's prior convictions. Defendant's reliance on *Johnson* is misplaced. In *Johnson*, the defendant was arrested and charged with misdemeanor domestic battery to the woman who owned the home in which he was living. *Id.* ¶ 5. The day after the battery, the victim called the police to retrieve a gun from her home. *Id.* ¶ 18. The police recovered a gun and ammunition from the defendant's bedroom. *Id.* The defendant was charged with two counts of unlawful possession of a weapon by a felon. *Id.* ¶ 4. Despite the fact that the domestic battery and the weapons charges were not part of the "same comprehensive transaction" so as to be susceptible to joinder, the parties agreed to join the three charges for a jury trial. *Id.* ¶¶ 5, 47, 50. Prior to trial, the trial court granted the State's motion to introduce prior uncharged incidents of domestic violence "to show defendant's propensity." *Id.* ¶¶ 7, 10. The trial court also allowed the State to introduce threats made during the incident for purposes other than propensity. *Id.* ¶ 11.

¶ 100    Prior to trial, the parties stipulated to the defendant's prior felony conviction as a predicate for the weapons charges. *Id.* ¶ 12. "The State agreed that, if defendant testified, his prior felony conviction was inadmissible for impeachment purposes, because it was more than 10 years old." *Id.* (citing *Montgomery*, 47 Ill. 2d at 516). Despite the fact that the prior felony was inadmissible for impeachment purposes, when the State read the stipulation into the record, the trial court advised the jury that " '[t]his information concerning the agreement of these facts can be used by you like any other evidence in this case to come to your verdict.' " *Id.* ¶ 29. The defendant testified and denied committing domestic battery as well as the prior incidents of domestic violence. *Id.* ¶¶ 30-32. The State's evidence showed that, besides the defendant, another man and the victim's son had lived in the home and the defendant's prints were not recovered from the gun. *Id.* ¶¶ 21, 28. The defendant testified that there was no lock on the bedroom door and that when he moved in there were items in the room that were not his. *Id.* ¶¶ 33-34.

¶ 101  "The trial court instructed the jury that it could consider the evidence of defendant's 'conduct other than those charged in the indictment,' for purposes of 'intent, motive, design, knowledge, absence of mistake, and propensity.' " *Id.* ¶ 35. On appeal, we agreed with the defendant's argument that his trial counsel was ineffective for agreeing to join the domestic battery charge with the charges of unlawful possession by a felon. *Id.* ¶ 38. The defendant argued that the joinder "had the effect of allowing the jury to consider otherwise inadmissible other-crimes evidence, which caused him to be prejudiced." *Id.* ¶ 42. The defendant argued that, on the weapons charges, the jury "should not have considered the two uncharged domestic violence incidents or the threats that accompanied those incidents." *Id.* We noted that the erroneous-jury-instruction issue was a separate matter from the joinder-of-charges issue, but we concluded "that the joinder of the charges, coupled with the improper jury instructions, mandates new, *separate* trials with precise jury instructions." (Emphasis added.) *Id.* We agreed with the defendant that the trial court's error in giving the jury a defective instruction together with the joinder "created a reasonable probability that the jury found defendant guilty of unlawful possession of a weapon by a felon after improperly considering the two uncharged domestic violence incidents and the threats that accompanied those incidents." *Id.* ¶ 58. We also said that there was a reasonable probability that the jury improperly considered the defendant's prior felony conviction in the domestic battery case and that it should have been limited to considering his status as a felon on the unlawful-possession-of-weapons charges. *Id.* ¶ 71.

¶ 102  The confluence of errors in *Johnson* have no resemblance to the facts of this case. There was no improper joinder of offenses in this case. Unlike in this case, where extrinsic evidence strongly corroborated Karina's testimony, the evidence in *Johnson* was close; it was a "credibility contest" between the defendant and the victim. *Id.* ¶ 55. In *Johnson*, there was no extrinsic evidence corroborating the victim's testimony regarding either the charged offenses or the other acts of domestic violence. *Id.* ¶ 50. In fact, in *Johnson*, the victim did not report the uncharged acts to the police. *Id.* Here, Karina reported the 2012 incident.

¶ 103  In the instance case, the jury was properly instructed pursuant to IPI Criminal Nos. 1.01, 3.13, and 3.14. The trial court instructed the jury that "any evidence that was received for a limited purpose should not be considered for any other purpose." See IPI Criminal No. 1.01. With respect to the evidence of prior acts of domestic violence, the trial court instructed the jury that "[t]his evidence has been received on the issue of defendant's propensity to commit acts of domestic violence and *modus operandi* and may be considered by you *only for those limited purposes.*" (Emphasis added.) See IPI Criminal No. 3.14.

¶ 104  This instruction also informed the jury that it should determine "whether defendant was involved in those offenses and if so, what weight should be given to this evidence on the issue of defendant's propensity to commit acts of domestic violence and *modus operandi*." See IPI Criminal No. 3.14. Defendant's instruction, IPI Criminal No. 3.13, was given, which informed the jury that defendant's "previous conviction of an offense may be considered by you only as it may affect his believability as a witness and must not be considered by you as evidence of his guilt of the offense with which he is charged."

¶ 105  Defendant's argument is identical to the argument made by the defendant in *People v. Banks*, 2016 IL App (1st) 131009. The defendant was charged in 2005 with a double murder and arson committed in 1990, based on a DNA "cold hit." *Id.* ¶¶ 1-2. The murders were committed in the course of the rape of a 12-year-old girl. *Id.* ¶ 1. Prior to trial, the State moved

to introduce a 1984 sexual assault as relevant to the defendant's propensity to commit sexual assaults and to motive and intent. *Id.* ¶ 9. The State was allowed to use a 1990 murder conviction " 'for the very limited purpose' " of impeachment. *Id.* ¶ 10. Prior to the testimony of the sexual assault victim from the 1984 case, the trial court advised the jury that the testimony " 'will be received on the issue of Defendant's propensity' " and " 'only for that limited purpose.' " *Id.* ¶ 47. The defendant testified, denying any involvement. *Id.* ¶ 50. In rebuttal, the State entered a certified copy of the defendant's 1990 murder conviction. *Id.* ¶ 51. The trial court advised the jury that the conviction may be considered " 'only as it may affect his believability.' " *Id.* On appeal, the defendant argued that "the jury was misinformed as to the proper way to use evidence of prior convictions because the jury instructions provided them did not draw a distinction between a conviction adduced for impeachment purposes and one adduced for propensity purposes." *Id.* ¶ 109. The appellate court rejected this argument, noting that, during the trial, the trial court instructed the jury, " 'Any evidence that was received for a limited purpose should not be considered by you for any other purpose.' " *Id.* ¶ 116. As in the instant case, the trial court also gave IPI Criminal Nos. 3.13 and 3.14. *Id.* ¶¶ 117-19. The appellate court noted that neither IPI Criminal No. 3.13 nor IPI Criminal No. 3.14 have blanks "in which parties or the court can insert the name of the offense in which the defendant was involved." *Id.* ¶ 119. The appellate court concluded that the jury instructions given accurately stated the law and comported with Rule 451(a), which provides that, if Illinois Pattern Jury Instructions contain an applicable instruction, then the Illinois Pattern Jury Instruction "shall" be given unless the court determines that it does not accurately state the law. *Id.* ¶ 120 (citing *People v. Durr*, 215 Ill. 2d 283, 301 (2005)). The appellate court also rejected the defendant's argument that trial counsel was ineffective for failure to tender modified other-crimes instructions, which identified the previous crimes and purpose for which each was allowed into evidence. *Id.* ¶¶ 122-24. The court held that the defendant was "unable to overcome the presumption that the contested conduct was not sound trial strategy, where counsel could have reasonably made the sound strategic determination not to focus the jury's attention on defendant's prior crimes." *Id.* ¶ 124 (citing *People v. Johnson*, 368 Ill. App. 3d 1146, 1161 (2006)).

¶ 106      While the trial court in *Banks* followed the preferred method of instructing the jury, both at the time the other-crimes evidence was introduced and at the close of the trial, the failure to do so "does not mandate reversal." *People v. Heard*, 187 Ill. 2d 36, 61 (1999). Here, the State correctly stated the proper purposes for which the other offenses were allowed into evidence during rebuttal argument.

¶ 107      In his reply brief, defendant argues that the "phrasing of the actual jury instructions" suggested that the convictions could be used "for purposes" other than those for which they were received. Defendant does not bicker with the State's argument that the State's rebuttal argument "told the jury how to properly use the prior convictions." Defendant notes that a closing argument is not evidence. While that is true, both the prosecution and the defense are permitted to comment on the law as it applies to the evidence in the case. During closing argument, the State is barred from misstating the law. *People v. Buckley*, 282 Ill. App. 3d 81, 89 (1996). Defendant concedes that the State did not misstate the law. As we have stated, in considering whether an instructional error deprived defendant of a fair trial, we consider all the circumstances, including closing argument. *Layhew*, 139 Ill. 2d at 486. Here, the certified copy of defendant's prior domestic battery conviction and Karina's testimony were admitted during

the State's case-in-chief. The prior felonies were introduced in the State's rebuttal, immediately after defendant's testimony.

¶ 108     Also, the trial court allowed only a single document showing defendant's domestic battery guilty plea to go back to the jury. Documents establishing defendant's multiple prior felony convictions did not go back to the jury.

¶ 109     Defendant argues that IPI Criminal No. 3.13, as given ("[e]vidence of a defendant's previous conviction of an offense"), was confusing because it suggested that it applied to only one prior conviction. We disagree. Criminal juries, applying their common sense, are capable of understanding instructions. See *Johnson v. Texas*, 509 U.S. 350, 368 (1993).

¶ 110     Defendant also argues that the propensity instruction referred to "offenses," suggesting that "more than one prior conviction could be used as propensity evidence," yet only one prior domestic battery conviction was admitted for propensity. Defendant forgets that Karina testified that defendant slapped or punched her and that he also took her cell phone from her by force and smashed it. Therefore, the instruction was accurate as more than one "offense" was committed.

¶ 111     The words "propensity" and "*modus operandi*" are not foreign to jurors. These words have ordinary meanings. In *People v. Hancock*, 329 Ill. App. 3d 367 (2002), the trial court refused to provide the jury with the defendant's proposed definition of propensity in a sexually-dangerous-person case. *Id.* at 372. During its closing rebuttal argument, the State argued that propensity " 'is inclination, tendency toward, urge toward doing something.' " *Id.* at 378. The defense argued that the trial court erred in allowing the argument. *Id.* The Fourth District held that the argument was not improper because the State's definition was consistent with Merriam-Webster's Collegiate Dictionary. *Id.* Like the word "propensity," the term "*modus operandi*" or "method of working" is not defined in any IPI Criminal pattern jury instruction but, as the trial court noted, the other-crimes instruction, IPI Criminal No. 3.14, includes these familiar terms. Common sense dictates that the jury understood that this instruction applied only to the 2012 domestic violence incident.

¶ 112     We note that the principal case defendant relied on for his argument that the other-crimes instruction posed a risk of confusion, *Johnson*, 2013 IL App (2d) 110535, has been distinguished in several appellate court opinions. See *People v. Young*, 2013 IL App (2d) 120167, ¶¶ 22-33 (in a drug-possession case, jury instructions that said other offense could be considered only for "knowledge and possession" was not plain error where evidence was admissible to show "knowledge and intent"); *People v. Clark*, 2015 IL App (1st) 131678, ¶¶ 77-80 (trial court error in omitting third paragraph of IPI Criminal No. 3.14 was not plain error where "there was no improperly joined charge"); *People v. Johnson*, 2014 IL App (2d) 121004, ¶¶ 50, 57-59 (IPI Criminal No. 3.14 instruction that improperly included purposes of "lack of mistake, motive, and *modus operandi*" was harmless error where the error was not compounded by improper joinder and the evidence was overwhelming).

¶ 113     Considering the wording of the instructions in totality, together with all the circumstances, we hold that defendant has failed to show that trial counsel's performance was deficient for failing to offer tailored jury instructions. Even if we were to find deficient performance, defendant could not establish prejudice because the evidence of guilt was overwhelming.

¶ 114                              4. Cumulative Error

¶ 115         Defendant argues that, even if no one error standing alone constitutes reversible error, the cumulative effect of multiple errors "may still necessitate a new trial." In this section of his brief, defendant assigns five errors: (1) trial counsel's failure to object to the strip club testimony, (2) the Rule 431(b) violation, (3) the fact that the jury was allowed to hear that defendant invoked his right to counsel, (4) the use of Person 2's statements in the phone call as prior consistent statements by Karina, and (5) the fact that the jury instructions did not specify which prior convictions could be used for which purposes. In this section, defendant assigns a sixth error and contends that, although not prejudicial by itself, the State's reference to the "jail call" during closing argument violated the trial court's pretrial ruling.

¶ 116         We have already addressed defendant's assigned errors (1) through (5). With respect to the sixth assigned error, the State, during its rebuttal argument, once referred to the phone call from "the jail." The State remarked, "He says in that jail call, 'When I hit her.' " Trial counsel did not immediately object, and the State continued, with its argument filling nine more pages of transcript. After the State concluded its argument, trial counsel moved for a mistrial. The assistant state's attorney stated that she did not remember referring to the "jail call" but agreed that, even if she did, it was not prejudicial and "it's cured by the instructions." The trial court stated that, "all things considered, at this time I will deny the motion for the mistrial."

¶ 117         "The decision whether to grant a mistrial is within the broad discretion of the trial court based on the particular circumstances of the case and should not be disturbed on review absent a clear abuse of discretion." *People v. Jackson*, 293 Ill. App. 3d 1009, 1019 (1997). A mistrial should be declared only where there is an occurrence of "such character and magnitude as to deprive a party of a fair trial and the moving party demonstrates actual prejudice." *Id.* at 1018-19. We note that there is an apparent conflict regarding the proper standard of review for claims of improper closing argument. In *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007), the court applied the *de novo* standard of review. In *People v. Blue*, 189 Ill. 2d 99, 128 (2000), the court applied the abuse-of-discretion standard. We need not resolve this conflict in this case, as our conclusion would be the same under either standard. The comment was isolated and was just one reference to where the call came from during the State's lengthy closing and rebuttal arguments, which filled 55 pages of transcript. Moreover, it is apparent in the call that defendant had just been arrested, as he asked Person 2 to take care of a number of things for him. Because it was reasonable to infer from the content of the call that defendant was being detained, defendant cannot demonstrate actual prejudice.


¶ 118                              5. Sentencing Error

¶ 119         Defendant argues that, in imposing its sentence, the trial court erred by considering a factor inherent in the offense of aggravated domestic battery based on strangulation, the one count on which he was sentenced. The trial court commented that, in addition to other factors in aggravation that applied, "Defendant's conduct caused or threatened serious harm." See 730 ILCS 5/5-5-3.2(a)(1) (West 2016). The court found that "the conduct of impeding the breathing of the victim is serious harm." Defendant correctly points out that this is the definition of strangulation as an element of aggravated domestic battery. 720 ILCS 5/12-3.3(a-5) (West 2016). "Generally," in sentencing a defendant for an offense, it is improper for the trial court to consider a factor necessarily implicit in that offense. *People v. Phelps*, 211 Ill. 2d 1, 11 (2004). "Stated differently, a single factor cannot be used both as an element of an offense and

- 24 -

as a basis for imposing 'a harsher sentence than might otherwise have been imposed.' " *Id.* at 11-12. Dual use of a factor in both the offense and the sentence is "referred to as a 'double enhancement.' " *Id.* at 12.

¶ 120    The State argues that this issue was forfeited because it was not included in the motion to reconsider the sentence. Defendant replies that, even if not preserved, the issue can be reviewed as plain error or ineffective assistance of counsel. The State is correct that the issue was not preserved, as it was included in neither defendant's motion to reconsider the sentence nor at argument on the motion to reconsider the sentence. A contemporaneous objection and a written postsentencing motion are required to preserve an argument for appeal. *People v. Hillier*, 237 Ill. 2d 539, 544 (2010).

¶ 121    Under either plain-error or ineffective-assistance-of-counsel review, defendant has the burden of showing that the trial court's consideration of an improper factor impacted the sentence. Defendant argues that the error can be reviewed under either prong of the plain-error rule. To obtain relief under the plain-error rule, defendant must show first that "a clear or obvious error" occurred. *Id.* at 545. "In the sentencing context, a defendant must then show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *Id.* Under either prong, defendant has the burden of persuasion.

¶ 122    "In determining whether the trial court based the sentence on proper aggravating and mitigating factors, a court of review should consider the record as a whole, rather than focusing on a few words or statements by the trial court." *People v. Dowding*, 388 Ill. App. 3d 936, 943 (2009). The Unified Code of Corrections requires the sentencing court to consider trial evidence, the presentence report, evidence in aggravation and mitigation, arguments of counsel, defendant's statement on his own behalf, and the impact on the victim. 730 ILCS 5/5-4-1 (West 2016). The court is not required to recite each factor. *People v. McDonald*, 322 Ill. App. 3d 244, 251 (2001). "[T]here is a strong presumption that the trial court based its sentencing determination on proper legal reasoning, and thus we review the trial court's sentencing decision with deference." *Dowding*, 388 Ill. App. 3d at 942-43 (citing *People v. Bowman*, 357 Ill. App. 3d 290, 303-04 (2005)). Defendant has the burden to affirmatively establish that the trial court based the sentence on improper considerations. *People v. Conley*, 118 Ill. App. 3d 122, 133 (1983).

¶ 123    Defendant has not met his burden of showing a "clear or obvious error." In announcing the sentence, the trial court remarked that it had considered the facts of the case, the presentence investigation, the relevant factors in aggravation and mitigation, and the matters presented at the sentencing hearing. Defendant was eligible for an extended-term sentence of 7 to 14 years, based on his prior convictions. The trial court stressed defendant's prior delinquency and criminal activity, which included gang-motivated offenses. The trial court considered the effect on Karina as well as any adverse effect on A.B. After reviewing all relevant factors, the trial court stated that the State's recommendation of 10 years "is not unreasonable." However, the trial court found that, "on more than one occasion" during his statement in allocution, defendant accepted responsibility for his conduct, and it imposed an eight year sentence. We note that defendant agrees with the State's argument that the trial court could properly consider the extent of "the pressure and the manner" in which defendant strangled Karina. See *People v. Saldivar*, 113 Ill. 2d 256, 268-69 (1986). We also note that the indictment treated the strangulation and the beating as separate acts. See *People v. Crespo*, 203 Ill. 2d 335, 345

- 25 -

(2001). The parties agreed to merge the counts because, on the Class 4 counts, defendant was eligible for a maximum sentence of only six years. It was proper for the trial court to consider the nature and extent of injuries other than those that resulted from the strangulation.

¶ 124 The court had also to consider defendant's extensive criminal history, beginning with being adjudicated a delinquent at the age of 13. At the age of 15, he was adjudicated delinquent for aggravated assault on a school employee. In 2009, at the age of 16, defendant was again adjudicated for attempted murder, armed violence, and unlawful discharge of a weapon in a gang-related shooting. In 2012, he committed the first domestic battery of Karina. Also in 2012, defendant committed an attempted home invasion, unlawful use of weapons, and aggravated fleeing and eluding police. In 2013, he was convicted of possession of a firearm without a FOID card. Defendant was on mandatory supervised release when he inflicted the May 27, 2016, beating on Karina.

¶ 125 The record amply supports the sentence imposed in this case. We reject the defendant's argument that the trial court gave significant weight to the strangulation.

¶ 126                              III. CONCLUSION
¶ 127 For the foregoing reasons, we affirm the defendant's conviction and sentence.

¶ 128 Affirmed.

¶ 129 JUSTICE HUDSON, specially concurring:

¶ 130 While I agree with most of the majority's opinion, I write separately to express my disagreement with its analysis of the issue concerning jury instructions. The manner in which the trial court instructed the jury concerning other-crimes evidence created a substantial probability that such evidence was used by the jury in an impermissible manner. I nevertheless am compelled to concur with the majority's ultimate holding, as I conclude that this error was not prejudicial in light of the overwhelming evidence of defendant's guilt.

¶ 131 Defendant argues that counsel was ineffective for failing to tender jury instructions that distinguished how the various prior convictions and bad acts could be used permissibly. The trial court allowed the State to introduce a prior conviction of domestic battery to show *modus operandi* and defendant's propensity to commit domestic battery. It also allowed the State to impeach defendant with convictions of attempted home invasion, aggravated fleeing or attempting to elude a peace officer, and possession of a firearm without a FOID card. Two jury instructions were given. Defendant tendered and the trial court gave Illinois Pattern Jury Instructions, Criminal, No. 3.13 (approved Oct. 17, 2014) (hereinafter IPI Criminal No. 3.13), instructing the jury as follows:

"Evidence of a defendant's previous conviction of an offense may be considered by you only as it may affect his believability as a witness and must not be considered by you as evidence of his guilt of the offense with which he is charged."

The trial court also gave an instruction based on Illinois Pattern Jury Instructions, Criminal, No. 3.14 (approved Oct. 17, 2014), which was tendered by the State:

"Evidence has been received that the defendant has been involved in offenses other than those charged in the indictment.

- 26 -

This evidence has been received on the issue of defendant's propensity to commit acts of domestic violence and *modus operandi* and may be considered by you only for those limited purposes.

It is for you to determine whether the defendant was involved in those offenses and if so, what weight should be given to this evidence on the issue of commit [*sic*] acts of domestic violence and *modus operandi*."

Defendant points out that neither instruction identifies to which of the convictions it applies.

¶ 132    Defendant relies primarily on *People v. Johnson*, 2013 IL App (2d) 110535. In that case, the defendant was jointly tried for the offenses of domestic battery and unlawful possession of a weapon by a felon. The State was permitted to introduce evidence of other uncharged incidents of domestic battery to show his propensity to commit domestic battery. *Id.* ¶¶ 7, 10; see 725 ILCS 5/115-7.4 (West 2010). The State further introduced an earlier felony conviction (the "predicate felony") to establish one of the elements of unlawful possession of a weapon by a felon, via a stipulation. When the stipulation was admitted, the trial court instructed the jury that " '[t]his information concerning the agreement of these facts can be used by you like any other evidence in this case to come to your verdict.' " *Johnson*, 2013 IL App (2d) 110535, ¶ 29. Subsequently, "[t]he trial court instructed the jury that it could consider the evidence of defendant's 'conduct other than those charged in the indictment,' for purposes of 'intent, motive, design, knowledge, absence of mistake, and propensity.' " *Id.* ¶ 35. As in the present case, the instructions did not specify to which prior bad acts they applied.

¶ 133    In *Johnson*, the defendant argued that trial counsel was ineffective for agreeing to a joint trial of the two charges. *Id.* ¶ 40. The reviewing court determined that this error was compounded by the improper manner in which the jury was instructed. *Id.* ¶ 42. It rejected the State's claim that this was a strategic decision, explaining, "We view no strategic reason for counsel's acquiescence to the joinder, *especially in light of counsel's failure to attempt to fashion a limiting instruction on other-crimes evidence*." (Emphasis added.) *Id.* ¶ 55. The *Johnson* court found this sufficient to support a claim of ineffective assistance of counsel. *Id.*

¶ 134    The State asserts that *Johnson* is distinguishable in that it involved two improperly joined charges. While it is true that joinder was an issue in *Johnson*, this is a bit of a red herring. The improper joinder in *Johnson* merely made it possible for the erroneous jury instructions to be given. The key point of *Johnson* is that it was error for counsel to allow the defendant's felony conviction to be considered on the issue of the defendant's propensity to commit domestic violence, and it was also error to allow the jury to consider the uncharged acts of domestic violence relative to the unlawful-possession-of-a-weapon charge. Given the instructions in this case, as in *Johnson*, there was a reasonable probability that the jury found defendant guilty of domestic violence after considering his three convictions of home invasion (attempt), fleeing and eluding, and possession of a firearm without a FOID card on the issue of propensity. Similarly, there is a reasonable probability that the jury considered the prior domestic battery as it pertained to defendant's credibility.

¶ 135    The majority cites *People v. Banks*, 2016 IL App (1st) 131009, in support of its result. However, there is a significant difference between what transpired in *Banks* and the instant case. In *Banks*, the trial court instructed the jury regarding the purpose for which the other-crimes evidence could be used contemporaneously with the admission of the evidence to which the instructions applied, respectively. *Id.* ¶¶ 114-15. This created an association between the instructions and the evidence to which they were related. Here, as the State concedes, "the

[trial] court did not present limiting instructions at the time the respective evidence was admitted." Hence, *Banks* provides little guidance here.

¶ 136    The majority notes that the trial court instructed the jury that "any evidence that was received for a limited purpose should not be considered for any other purpose." See Illinois Pattern Jury Instructions, Criminal, No. 1.01 (approved July 18, 2014) (hereinafter IPI Criminal No. 1.01). This instruction provides no assurance that other-crimes evidence was not misused because the jury was never properly instructed as to how it could use the evidence at issue or how such evidence could not be used. For example, the jury was told that it could use evidence that defendant was involved in other, uncharged offenses on the issue of propensity, but it was not told that it could only consider the prior domestic battery in this manner. Thus, the jury could have considered the other prior offenses on the issue of propensity and simply determined that defendant is a bad person, entirely consistently with the admonition contained in IPI Criminal No. 1.01. Moreover, the danger in the inference that the jury was allowed to draw here is well recognized: "Such evidence overpersuades the jury, which might convict the defendant only because it feels he is a bad person deserving punishment." *People v. Thingvold*, 145 Ill. 2d 441, 452 (1991).

¶ 137    It is true that, in its closing argument, the State did suggest to the jury how the other-crimes evidence could be properly used. However, it did not tell the jury what uses for this evidence were impermissible. That is, while it properly argued to the jury that the prior domestic battery could be considered on the issue of propensity, it did not tell the jury that the other such evidence could not be used in this fashion. Where the trial court's instructions expressly allowed for such a use for all other-crimes evidence, the State's at-best tangential limitation of this evidence to its proper purpose provided no more than a weak safeguard that such evidence would not be misused. After all, jury instructions come from the judge and not the State (*People v. Speight*, 153 Ill. 2d 365, 374-75 (1992)), which the State emphasized in both purportedly curative passages, by telling the jury that it would get the "instruction from the Judge."

¶ 138    In sum, there exists a substantial probability in this case that the jury used other-crimes evidence for improper purposes in arriving at its verdict. Nevertheless, given the overwhelming nature of the evidence against defendant, I am compelled to agree with the majority's conclusion that defendant cannot establish that he was prejudiced, as is necessary to prevail on a claim of ineffective assistance of counsel. See *People v. Griffin*, 178 Ill. 2d 65, 91 (1997). Accordingly, I specially concur.